**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

CHEF TIME 1520 LLC, *et al.*,

      *Plaintiffs*,


v.


SMALL BUSINESS ADMINISTRATION,
*et al.*,

      *Defendants*.

Civil Action No. 22-3587 (RDM)

---

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter arises from Plaintiffs' efforts to seek financial assistance from the Restaurant Revitalization Fund ("RRF"), created by Congress in the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 4, to help restaurants and other eligible businesses pay "expenses incurred as a direct result of, or during, the COVID-19 pandemic," 15 U.S.C. § 9009c(c)(5).  Plaintiffs, two restaurants in Dallas, Texas, bring claims against the Small Business Administration ("SBA") and its Administrator, alleging that the SBA's failure to award the restaurants' RRF funding was arbitrary, capricious, contrary to law, and unsupported by substantial evidence, in contravention of 5 U.S.C. § 706(2)(A) and (E).  Before the Court is Plaintiff's motion for a temporary restraining order ("TRO"), Dkt. 5, which is opposed, Dkt. 14. For the reasons that follow, the Court will **GRANT** in part and **DENY** in part that motion.

### I.  BACKGROUND

**A.**    **Statutory Background**

As part of the American Rescue Plan Act of 2021, Congress allocated close to $29 billion for RRF grants, 15 U.S.C. § 9009c(b)(2)(A), to help restaurant owners meet payroll and other

"expenses incurred as a direct result of, or during, the COVID-19 pandemic," *id.* § 9009c(c)(5). The fund was designed to assist "restaurant[s], food stand[s], food truck[s], food cart[s], caterer[s], . . . bar[s], lounge[s], brewpub[s]" and other like businesses "in which the public or patrons assemble for the primary purpose of being served food or drink," *id.* § 9009c(a)(4)(A), but it excludes those businesses that, "together with any affiliated business," operated "more than 20 locations," *id.* § 9009c(a)(4)(C). "[T]he amount of a grant made to an eligible entity" is based on the entity's "pandemic-related revenue loss." *Id.* § 9009c(c)(4)(B)(i). An entity's "pandemic-related revenue loss" is calculated by subtracting the entity's 2020 "gross receipts, as established using such verification documentation as the Administrator may require," from its 2019 gross receipts, *id.* § 9009c(a)(7); that figure is also "reduced by any amounts" the business previously "received from a [Paycheck Protection Program] loan," *id.*; *see also id.* § 636(a)(36).

The statute provides that the Administrator of the SBA "shall," as a general matter, "award grants to eligible entities in the order in which applications [were] received by the Administrator." *Id.* § 9009c(c)(1). But it also requires that, "[d]uring the initial 21-day period in which the Administrator awards grants under the subsection, the Administrator shall prioritize awarding grants" to small businesses "owned and controlled by women" and "by veterans" as well as to "socially and economically disadvantaged small business concerns," as those terms are defined in the statute, *id.* § 9009c(c)(3)(A).

## B.    Factual Background

### 1.    *The RRF Program*

The SBA began accepting RRF applications through an online portal on May 3, 2021, Dkt. 14-1 at 2 (Piccioni Decl. ¶ 5)—although a select group of applicants was invited to submit applications a few days prior as part of a "pilot phase," *see* Dkt. 5-2 at 6 (Luke Decl. Ex. 1).

Once an application was submitted, the agency began processing it with the intention of confirming the applicant's eligibility and ensuring that the requested amount of RRF funding was accurate.  Dkt. 14-1 at 2 (Piccioni Decl. ¶ 9).  For the first 21 days after the portal opened on May 3, the SBA processed applications only from those businesses owned and controlled by women and veterans and from "socially and economically disadvantaged" small business concerns.  *Id.* at 3 (Piccioni Decl. ¶¶ 10–12).  Among those priority applicants, the SBA initiated processing based "on the date the application was electronically signed and submitted."  *Id.* (Piccioni Decl. ¶ 8).  But not all applications took the same amount of time to process:  As the SBA explains, "some applications were more complicated than others and took longer to review" and others "had omissions or errors" that needed to be corrected by the applicants.  *Id.*

The first step in processing an RRF application was to transmit the applicant's revenue information to the IRS for verification.  *Id.* at 2 (Piccioni Decl. ¶ 9).  If there was a discrepancy between the tax information the SBA received from the IRS and the gross receipts reported on the application, the SBA "worked with the applicant to resolve the discrepancy or to correct the error."  *Id.*  If an error in the award amount was what the SBA deemed "de minimis," the agency allowed the applicant to correct its application without requiring it to refile.  *Id.*  But, if the discrepancy in their application exceeded the lesser of 5% of the award or $25,000, "the applicant was required to re-sign [its] application."  *Id.* at 2–3 (Piccioni Decl. ¶ 9).  The new signature would, then, give the application a new submission date, effectively moving the application "to the back of the queue."  *Id.* at 3 (Piccioni Decl. ¶ 9).

Once the agency fully confirmed an applicant's eligibility, the "processing status" of the application changed to "Fully Approved;" the applicant was notified of that change; and the application was processed in SBA's payment system before the money was ultimately disbursed

to the applicant.  *Id.*   According to the SBA, during the initial phase of processing applications, the agency paid applicants in the order in which their applications were fully approved.  Tr. at 24–25 (Dec. 14, 2022 Hearing) ("[The SBA] was paying applications as soon as they were fully approved.").

The statutorily mandated priority application period concluded on May 24, 2021, and the SBA began processing applications from non-priority applicants the next day.  Dkt. 14-1 at 3 (Piccioni Decl. ¶¶ 12–13).  On May 27, 2021, the SBA paused processing priority applications altogether—including "those undergoing final processing in SBA's payment system."  Dkt. 14-1 at 3 (Piccioni Decl. ¶ 14).  According to the SBA, it "planned to resume processing priority applications once it completed processing the [earlier] filed non-priority applications," but, before it could do so, "the fund was [exhausted] and all processing ceased."  *Id.*  The SBA announced the closure of the RRF program on July 2, 2021.  *Id.* at 4 (Piccioni Decl. ¶ 15).

Sometime after the fund's depletion, about $83 million of the previously obligated funds were returned to the SBA.  *Id.* (Piccioni Decl. ¶ 16–17).  In assessing how to distribute those remaining funds, the SBA took a different approach from the one it adopted in May and June 2021: this time around, it considered neither priority status nor the date on which the application was "fully approved."  *Id.* (Piccioni Decl. ¶ 17).  Rather, the agency allocated the funds to the pool of fully approved applications in the order in which the applications were *submitted*, as reflected by "when applicants signed their applications using DocuSign."  *Id.* (Piccioni Decl. ¶ 17).  According to this methodology, the $83 million was allocated to 169 eligible applicants, the last of which submitted their applications at 1:19 PM on May 3, 2021.  *Id.* (Piccioni Decl. ¶ 18).  The SBA began distributing the $83 million to those 169 applicants on November 23, 2022.  *Id.* (Piccioni Decl. ¶ 19).

As of November 29, 2022, the SBA had paid 167 of those applicants but had not yet paid the remaining two applicants, identified as Applicants 135 and 151. *Id.* at 5 (Piccioni Decl. ¶¶ 20–22). If fully funded, those two applicants would receive a total amount of about $2 million. *Id.* In addition, roughly $5.4 million in attempted disbursements failed due to "problems with the bank information provided by the applicant," "an issue with the account number," or the closure of "the corresponding account." *Id.* at 5–6 (Piccioni Decl. ¶ 24). The SBA planned on contacting "the respective applicant to ascertain if the problem could be resolved," but "out of deference to the Court's administrative stay"—which applied only with respect to the payments to Applicants 135 and 151—the SBA delayed taking action "with respect to the nine failed disbursements." *Id.* at 6 (Piccioni Decl. ¶ 25). Subsequently, the Court clarified that its administrative stay required only that the SBA refrain from disbursing an amount sufficient to cover Plaintiffs' claims pending briefing, oral argument, and a decision on their motion for a TRO. Tr. at 48 (Dec. 14, 2022 Hearing).

2. *The Woolworth and Smithy*

Brandon Luke is a veteran of the United States Army and a majority owner of two restaurants in Dallas, Texas: The Woolworth and Smithy. Dkt. 5-2 at 2 (Luke Decl. ¶¶ 1–5, 7–8). On April 22, 2021, Luke received an email from the SBA, informing him that he had been "randomly selected for an opportunity to participate in the pilot phase for" the RRF, which would allow participants to "complete the RRF application before the portal open[ed] to the greater public." Dkt. 5-2 at 6 (Luke Decl. Ex. 1). Luke agreed to participate; he applied for funding on behalf of both of his restaurants on April 27, 2021, requesting $1,344,299 on behalf of The Woolworth and $509,881 on behalf of Smithy. Dkt. 5-2 at 3 (Luke Decl. ¶¶ 7–9); Dkt. 14-1 at 6 (Piccioni Decl. ¶ 27). That evening, Luke received two emails notifying him that he

had "successfully completed the electronic signature process associated" with his application and alerting him that the SBA would "review th[e] application, verify the supporting documentation, and process [his] award if applicable." Dkt. 14-2 at 1–2. The applications received two confirmation numbers: 882a00074896 was associated with The Woolworth and 2c090074905 was associated with Smithy. Dkt. 14-1 at 6 (Piccioni Decl. ¶¶ 27–28).

With respect to The Woolworth's application, Luke represents that he was advised in mid-May 2021 that "updates to The Woolworth's application were required." Dkt. 5-2 at 3 (Luke Decl. ¶ 10). But Luke avers that he "could not open the application" to make the requested updates and that he was eventually instructed by the SBA to resubmit his application. *Id.* (Luke Decl. ¶¶ 10–11). According to the agency, Luke withdrew The Woolworth's application on the afternoon of May 10, 2021—"[f]or reasons unknown to SBA"—at which time the original application was "reduced to basic technical data" and therefore not available in any decipherable format for this Court to review. Dkt. 14-1 at 6 (Piccioni Decl. ¶ 27); *see also* Tr. at 26 (Dec. 14, 2022 Hearing). Luke resubmitted his application on behalf of The Woolworth on May 14, 2021, and the resubmitted application received a new confirmation number: 36e600394091. *Id.* at 7 (Piccioni Decl. ¶ 30). That application did not make it beyond the early stages of review when the SBA paused processing veteran-owned applications on May 27, 2021. *Id.* (Piccioni Decl. ¶ 30).

Smithy's application took a different path. According to the agency, the SBA sent Smithy's tax forms to the IRS for verification on April 28, 2021—the day after the application was submitted. *Id.* (Piccioni Decl. ¶ 28). The IRS returned the forms to the SBA on May 6, 2021, at which point the agency noticed discrepancies between the tax forms and Smithy's application. *Id.* On May 7, 2021, the SBA informed Luke of those discrepancies and explained

6

that, based on the SBA's calculation, Smithy would be entitled to an award of only $451,829 (rather than the $509,881 he requested). Dkt. 14-4 at 1. The agency also clarified, at that time, that "[t]he [award] calculation requires gross sales to be used," *id.*, rather than the point-of-sale figures that Luke used in his application, *see* Tr. at 9 (Dec. 14, 2022 Hearing). From the records submitted by the agency, it appears to have taken the agency several days to unlock the application to allow Luke to make the necessary revisions. Dkt. 14-5 at 1. He was finally able to do so on May 14, 2021, Dkt. 14-7 at 1; but, because the discrepancy between the SBA's calculated award ($451,829) and the entitlement claimed on Smithy's initial application ($509,881) exceeded the *de minimis* threshold of $25,000, Luke was required to re-sign Smithy's application, and the agency treated May 14, 2021—the date of the renewed signature—as the new date of submission. Dkt. 14-1 at 6 (Piccioni Decl. ¶ 28).

After Luke re-signed Smithy's application, the SBA reviewed the application anew and deemed it "Fully Approved" on May 26, 2021, two days after the expiration of the 21-day priority processing window. *Id.* at 6 (Piccioni Decl. ¶ 29). That day, the agency sent Smithy's application (along with 2,964 other priority applications, *id.* at 6–7 (Picconi Decl. ¶ 29)) to SBA's payment system for final processing, and Smithy was notified on May 28, 2021 that its RRF application "ha[d] been approved" and that "[t]he SBA w[ould] now process the funding of this award directly to [Smithy's] Bank account within 3-7 business day from th[e] notification." Dkt. 5-2 at 8 (Luke Decl. Ex. 2).

Smithy never received the award; rather, on June 12, 2021, the SBA notified Smithy that "due to recent court rulings, the [SBA] will not be able to disburse your Restaurant Revitalization Fund award." Dkt. 5-2 at 10 (Luke Decl. Ex. 3). The SBA explained that, because of recent litigation arising out of the Northern District of Texas and the Eastern District

of Tennessee, "[t]he SBA is not able to pay 2,965 priority applicants—including yourself—who were previously approved and notified of their approval." *Id.*  In the relevant rulings, the courts held that the government may not "allocate limited coronavirus relief funds based on the race [or] sex of the applicants." *Vitolo v. Guzman*, 999 F.3d 353, 357 (6th Cir. 2021).  The courts did not, however, cast doubt on the SBA's authority to "continue to give veteran-owned restaurants priority in accordance with the law." *Id.* at 366; *see also Blessed Cajuns LLC et al. v. Guzman*, No. 21-cv-677 (N.D. Tex. May 28, 2021), *see* Dkt. 5-1 at 10.

## C.    Procedural Background

Plaintiffs filed suit under the Administrative Procedure Act ("APA") on November 28, 2022, Dkt. 1 (Compl.), asserting that the SBA's "fail[ure] to retain The Woolworth's place in queue after it directed the restaurant to resubmit the application because of technological problems on the SBA's end" was "arbitrary and capricious" and "contrary to law," Dkt. 5 at 15; Dkt. 1 at 6 (Compl. ¶ 28), and that the SBA's mistaken reliance on the court rulings referenced in its June 12, 2021 letter resulted in an arbitrary and unlawful decision to decline disbursing Smithy's funds, Dkt. 1 at 8 (Compl. ¶¶ 36, 39) (quoting 5 U.S.C. § 706(2)(A), (E)).  The next day, Plaintiffs moved for a temporary restraining order and asked this Court to direct that the SBA preserve funds sufficient to fully fund Smithy's and The Woolworth's RRF applications. Dkt. 5 at 1.

After the SBA informed the Court that it had paid 167 of the 169 eligible applicants selected to receive portions of the $83 million in remaining funds and that the agency retained approximately $2 million in RRF funding that had been allocated to the final two applicants, Dkt. 7-1 at 4–5 (Piccioni Decl. ¶¶ 20–21), the agency requested an opportunity to investigate Plaintiffs' claims.  The Court agreed, but entered an administrative stay ordering the agency to

preserve the remaining $2 million in RRF funding while the agency did so.  Dkt. 8 at 3.  The

parties appeared for a hearing on the motion for temporary restraining order on December 14,

2022, *see* Min. Entry (Dec. 14, 2022), and the motion is now ripe for resolution.

## II.  LEGAL STANDARD

"A TRO is 'an extraordinary form of relief.'"  *Costa v. Bazron*, 456 F. Supp. 3d 126, 133

(D.D.C. 2020) (quoting *Banks v. Booth*, 459 F. Supp. 3d 143, 149 (D.D.C. 2020)).  The decision

of whether to award a TRO is "analyzed using the same 'factors applicable to preliminary

injunctive relief,'" and a TRO "may only be awarded upon a clear showing that the plaintiff is

entitled to such relief."  *Id.* (quoting *Banks*, 459 F. Supp. 3d at 149).  To obtain a TRO, a movant

"must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer

irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his

favor, and [4] that an injunction is in the public interest."  *Aamer v. Obama*, 742 F.3d 1023, 1038

(D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).  When

seeking such relief, "the movant has the burden to show that all four factors, taken together,

weigh in favor of the injunction."  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014)

(quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)); *see also*

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an

extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear*

*showing*, carries the burden of persuasion." (internal citation and quotation marks omitted)

(emphasis in original)).

Before the Supreme Court's decision in *Winter v. NRDC*, 555 U.S. 7 (2008), courts in

this circuit applied a "sliding-scale" approach under which "a strong showing on one factor could

make up for a weaker showing on another."  *Sherley*, 644 F.3d at 392.  Since *Winter*, the D.C.

Circuit has hinted on several occasions that "a likelihood of success is an independent, free-standing requirement," *id.* at 393 (internal citation and quotation marks omitted), but it "has not yet needed to decide th[e] issue," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016); *see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022).

## III.  ANALYSIS

### A.    Likelihood of Success on the Merits

A court may "hold unlawful and set aside" agency action if—as relevant here—it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or if it is "unsupported by substantial evidence," *id.* § 706(2)(E).  Although this standard of review is a "deferential" one, *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 233 (D.C. Cir. 2008), agency action must nevertheless be the product of "reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  Accordingly, courts will typically find an agency action to be "arbitrary and capricious" only if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43.  Agency fact-finding warrants considerable deference, moreover, so long as it is supported by "substantial evidence."  5 U.S.C. § 706(2)(E).

1.    *Administrative Record*

The Court begins its analysis with a threshold note about the scope of the administrative record before it.  At this very early stage, the SBA has yet to compile or to certify an administrative record, and the parties have submitted only a handful of communications between

the SBA and Luke between April and June of 2021.  Accordingly, at this juncture, the Court lacks a complete record regarding the agency's internal policies for distributing RRF funding or its interpretation of 15 U.S.C. § 9009c.  To fill this gap, the SBA has filed a declaration from Vanessa Piccioni, the Director of the SBA's National Guaranty Purchase Center, who attests that she "assisted in reviewing certain RRF applications and [is] knowledgeable about the RRF program."  Dkt. 14-1 at 1 (Piccioni Decl. ¶ 1).

In considering a motion for a preliminary injunction, a district court must base its review "on the full administrative record that was before the [agency] at the time [it] made its decision," *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 583 (D.C. Cir. 2001) (second alteration in original) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)), and may not rely on "the parties' written or oral representations" or on "sworn affidavits filed during the litigation" to discern the basis of agency actions, *id.*  That rule, however, cannot sensibly extend to a motion for temporary retraining order, which seeks to maintain the status quo for the brief time necessary for the parties litigate whether a preliminary injunction should issue.  To be sure, the Court may not deny a motion for a TRO merely because the agency has not had time to prepare the administrative record.  But, at the same time, the Court may not issue a TRO without holding the movant to its burden of demonstrating a likelihood of success on the merits.  Here, the parties have provided the Court with a handful of agency communications with the applicants and the Piccioni declaration, which explains how the agency processed the RRF applications.

The Court may consider extra-record material, such as a declaration offered by a knowledgeable agency official, under "unusual circumstances justifying a departure from [the] general rule."  *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Tex. Rural Legal Aid v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991)).  The D.C. Circuit

has identified at least three such circumstances, including, as relevant here, when "the agency failed to explain administrative action so as to frustrate judicial review." *Animal Legal Def. Fund v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)); *see also Dania Beach*, 628 F.3d at 590 (listing the same three exceptions); *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (same). That exception applies here. The circumstances are "unusual" due to the time pressure posed by a motion for a TRO, and, even more significantly, the RRF program itself required the agency to act expeditiously without providing sufficient time for detailed agency opinions at each critical stage in the process. Consideration of the Piccioni declaration does not represent "an end run around the agency's substantive . . . judgments," *CTS Corp. v. EPA*, 759 F.3d 52, 65 (D.C. Cir. 2014), but, rather, represents the Court's only available glimpse into the process the SBA employed. Finally, the Court is aided by the fact that the parties—at least for present purposes—do not dispute the central elements of that process, including the manner in which applications were prioritized at various stages in the process.

The Court will, accordingly, base its decision on the administrative materials that the parties have produced to date and on the Piccioni declaration, which sets forth the process that the agency employed in prioritizing and approving applications. To the extent that additional record materials exist, the SBA will be required to assemble and to certify an administrative record in time for the Court to evaluate a motion for a preliminary injunction, should Plaintiffs file one.

2.   *The Woolworth*

Plaintiffs argue, first, that the SBA's "fail[ure] to retain The Woolworth's place in queue after it directed the restaurant to resubmit the application" was both "arbitrary and capricious,"

Dkt. 5 at 15, and contrary to § 9009c, which directs the SBA Administrator to "award grants to eligible entities in the order in which applications are received by the Administrator," 15 U.S.C. § 9009c(c)(1); *see* Dkt. 15 at 6.  At oral argument, counsel for Plaintiffs clarified—and Defendants did not contest—that Luke was asked to make edits to The Woolworth's application for the same reason that he had to adjust Smithy's application: as to both restaurants, Luke apparently used point-of-sale records rather than gross-receipts records in submitting his application, requiring amendments to the applications.  Hearing Tr. at 9 (Dec. 14, 2022).  The only distinction, then, between the application processes for Luke's two restaurants seems to be that Luke had to re-submit The Woolworth's application (apparently due to technical difficulties that prevented him from editing the application), while he could edit and re-sign Smithy's application without generating a new application number.  *Id.*  But the result was effectively the same: the parties agree for present purposes that both applications, one re-signed and one-resubmitted, were treated by the agency as newly submitted on May 14, 2022.

Plaintiffs also do not dispute the existence of an SBA policy requiring resubmission or re-signature of certain erroneous applications; nor do they dispute that, when the SBA required such resubmission, the agency treated the application as complete on the date of resubmission, rather than on the date the applicant originally applied for RRF funding.  Plaintiffs themselves represent that Luke had to resubmit The Woolworth's application because of discrepancies between the financial records in the application and the information on the restaurant's tax returns.  And Luke nowhere contends that those discrepancies were *de minimis* under the SBA's processing procedures, such that, absent the technological difficulties in editing his application, Luke would have been able to edit The Woolworth's application without (at a minimum) re-

13

signing it and triggering a new effective date.[1]  Rather, Plaintiffs argue, without more, that requiring Luke to submit a "new" application in order to correct the errors in The Woolworth's first application was arbitrary and capricious.  The Court is, at this juncture, unpersuaded.

The relevant statute, which requires only that the SBA Administrator "award grants to eligible entities in the order in which the applications are received," 15 U.S.C. § 9009c(c)(1), does not speak to the question of whether the agency must allow an applicant to make material post-submission corrections to his application.  In other words, the text does not require the agency to award grants according to when an applicant's *first application* was received, rather than, say, when the applicant's *first substantially complete* application was received.  Nor has Plaintiff offered any authority for the proposition that it was arbitrary and capricious for the SBA to require Luke to resubmit The Woolworth's application with the correct information.

Plaintiffs' counsel asserted at oral argument that it was "arbitrary" and "fundamentally unfair" for the SBA to "cost the applicant his place in line," Tr. at 11 (Dec. 14, 2022 Hearing), where the SBA "didn't tell [Luke] clearly that [he] had to submit the numbers from [his] tax return as opposed to [his] point of sale records," *id.* at 10.  But that question of notice was not raised in Plaintiffs' motion for temporary restraining order or in their reply.  Defendants, moreover, contest the idea that applicants were deprived of such notice: counsel explained at the hearing that "there were different worksheets" that applicants could use "depending on what type of business [they] had and what [their] revenue was;" that there were "different formulas that applied;" and that all of that information "was . . . communicated to the general public."  Tr. at 29–30 (Dec. 14, 2022 Hearing).  And, even more importantly, the statute itself clearly requires

---

[1] Whether the SBA's technological failures were at fault for the required resubmission may, then, be less material here than the nature and extent of the discrepancies between The Woolworth's initial application and the tax information obtained from the IRS.

the use of "*gross receipts*, as established using such verification documentation as the Administrator may require" in order to calculate the "pandemic-related revenue loss," 15 U.S.C. § 9009c(a)(7) (emphasis added), rather than the "point of sales reports" that the Woolworth apparently used.  In any event, without briefing on this question or evidence to support either parties' position on the notice question, the Court declines to reach that argument at this stage of the proceeding.

At most, Plaintiffs point to *U.S. AirWaves, Inc. v. FCC*, 232 F.3d 227 (D.C. Cir. 2000) for the proposition that "unfair agency action can be arbitrary and capricious."  Dkt. 15 at 7.  But the D.C. Circuit in *U.S. Airwaves* also acknowledged that "an agency must be allowed to adjust its policies to changing circumstances" and that, even if such a change is "unfair" or "inequit[able]," it is not necessarily arbitrary and capricious where the agency "reasonably exercised its discretion to balance fairness to losing bidders with the needs of the market and with the public interest."  *U.S. Airwaves, Inc.*, 232 F.3d at 235–36.  At the present juncture, Plaintiffs, who carry the burden of establishing that they are likely to succeed on the merits, *Mazurek*, 520 U.S. at 972, have not established that it was likely arbitrary and capricious for the SBA to treat The Woolworth's application as submitted on May 14, 2021—that is, the date on which it was substantially complete.

3.  *Smithy*

A separate question remains as to Smithy's application, which (unlike that of The Woolworth) achieved "Fully Approved" status and was, according to the records presently before the Court, slated for payment as of May 26, 2021.  Dkt. 5-2 at 8 (Luke Decl. Ex. 2); Dkt. 14-1 at 6 (Piccioni Decl. ¶ 29).  On June 12, 2021, however, the agency communicated to Luke that it would not fund Smithy's application—although the agency now indicates that the relevant

decision to pause funding all "fully approved" priority applications was reached internally on May 27, 2021.  *See* Dkt. 14-1 at 7 (Piccioni Decl. ¶ 29).  Plaintiffs argue that the SBA's decision not to fund Smithy's application was both arbitrary and capricious and contrary to § 9009c(c)(3), which requires the Administrator to prioritize awarding grants to veteran-owned business during the 21-day statutory priority period.  Dkt. 5 at 16.  In particular, Plaintiffs contend that the SBA misunderstood the court rulings it referenced in its June 12, 2021 letter to Luke, which, in their view, did not alter the requirement that the SBA prioritize funding restaurants owned by veterans.  *Id.* at 15–16.

To the extent that the SBA decided to pause funding Smithy's application on May 27, 2021 (or, in any event, sometime after Smithy's application reached "fully approved" status on May 26, 2021), that decision does not appear to conflict with § 9009c.  The statute requires only that "the Administrator . . . prioritize awarding grants to eligible entities" for the "initial 21-day period in which the Administrator awards grants under" the RRF, 15 U.S.C. § 9009c(c)(3)(A)—a period that expired on May 24, 2021, Dkt. 14-1 at 3 (Piccioni Decl. ¶ 12).  By all accounts, the SBA did "prioritize awarding grants" to veteran-owned businesses during the 21-day window after May 3, 2021: the SBA processed only those applications submitted by priority applicants during that window, *id.* at 3 (Piccioni Decl. ¶ 11), and it took the necessary steps to process Smithy's application, including by ensuring the application was complete and correct and and, ultimately, by deeming the application "Fully Approved" on May 26, 2021, *id.* at 6 (Piccioni Decl. ¶ 29).  That the SBA ultimately stopped prioritizing priority applicants like Smithy *after* the expiration of the priority period, however, does not conflict with the agency's statutory obligations.

But that conclusion does not end the inquiry.  Even if the agency's decision to pause priority processing was not foreclosed by the statute, the agency was nevertheless required to engage in "reasoned decisionmaking;" the APA directs that "agency actions be 'set aside' of they are 'arbitrary' or 'capricious,'" *Dep't of Homeland Sec'y v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1905 (2020) (first quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015), and then quoting 5 U.S.C. § 706(2)(A)), including where, among other things, the agency "offer[s] an explanation for its decision that runs counter to the evidence before [it]," *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.  "Under this narrow standard of review, . . . a court is not to substitute its judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Regents of the Univ. of Calif.*, 140 S. Ct. at 1905 (internal quotation marks and citation omitted).

In evaluating whether the agency's decision was arbitrary and capricious, the Court looks, as it must, to "the grounds that the agency invoked when it took the action" to pause priority processing.  *Michigan*, 576 U.S. at 758.  The agency set forth is rationale in its June 12, 2021 letter to Luke: "The SBA is not able to pay 2,965 priority applicants—including yourself— who were previously approved and notified of their approval.  SBA will not pay these claims because the legal conclusions in these court rulings would preclude payment."  Dkt. 5-2 at 10 (Luke Decl. Ex. 3).  But contrary to that reasoning, the "legal conclusions" in those court rulings did not "preclude payment" of Smithy's award.  Rather, as the SBA now acknowledges, the decisions in *Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021) and in *Blessed Cajuns LLC et al. v. Guzman*, No. 21-cv-677 (N.D. Tex. May 28, 2021), *see* Dkt. 5-1 at 2, "did not question . . . the constitutionality of the priority afforded to veterans," Dkt. 14 at 12.  The SBA is correct that "those courts did not *require* [the] SBA to continue offering such a priority after the expiration of

17

the statutory priority either." *Id.* (emphasis added).  But even if the decision to pause priority processing was a discretionary one, the agency was required to justify its decision on a legally coherent ground.  *Cf. Regents of the Univ. of Calif.*, 140 S. Ct. at 1912 (finding the rescission of DACA forbearance arbitrary and capricious where the agency incorrectly "treated the Attorney General's conclusion regarding the illegality of [DACA-related] *benefits* as sufficient to rescind both benefits and *forbearance*, without [further] explanation" (emphases added)).  It did not do so.

Seeking to avoid the obvious implication of its June 12, 2021 letter, the agency now asserts that the SBA's decision to pause processing priority applications on May 27, 2021 was "in large part because there was nothing in the statute requiring this processing out of order to continue," and because "there[] [are] good reasons in the statute to bring the applications back onto a level playing field."  Tr. at 35 (Dec. 14, 2022 Hearing).  The agency indicates, in this vein, that the June 12 letter was not directed to Luke or to veterans: it was, rather, a blast email to "2,965 applicants, many of which were owned by women or socially-and-economically-disadvantaged individuals directly affected by" the referenced court rulings.  Dkt. 14 at 12.  But the agency may not now supply a rationale for its decision that is nowhere to be found in its June 12, 2021 letter or even—assuming the Court may consider such evidence at this preliminary stage, *see supra* at 10–12—in the declarations submitted by the agency.  The Piccioni declaration posits only that the "SBA planned to resume processing priority applications once it completed processing the previously filed non-priority applications."  Dkt. 14-1 at 3 (Piccioni Decl. ¶ 14).  But nowhere does it suggest that the agency decided to pause processing applications from veteran-owned businesses for any reason other than the court rulings in *Vitolo* and *Blessed Cajuns*; nor does it indicate that the agency appreciated "the full scope of [its] discretion" in

reaching its decision. *Regents of the Univ. of Calif.*, 140 S. Ct. at 1911.  The record presently before the Court strongly suggests, then, that the decision not to fund Smithy's award was based on a "clear error of judgment" and was, therefore, arbitrary and capricious.  *Id.* at 1905 (quoting *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 416).

The agency marshals one further argument at this stage that bears mentioning, although it speaks more to the question of remedy than to the merits.  The SBA contends that, whatever problems existed during the initial distribution of funds in June 2021, at this stage, it is, "impossible to [un]scramble the egg and start with a blank slate," Tr. 47 (Dec. 14, 2022 Hearing), particularly because the agency is now distributing its remaining funds according to the date on which applications were submitted (rather than, as it was doing in 2021, the date upon which the application became "fully approved"), Dkt. 14-1 at 4 (Piccioni Decl. ¶ 17). Under this reasoning, if the agency can properly conclude that both of Luke's applications were submitted on May 14, 2021 (and not on April 27, 2021), then the agency might decide, even on a hypothetical remand, not to fund Smithy's application.

It is premature, however, for the Court to assess the merit of that argument.  As a general matter, if the grounds invoked by the agency in taking an action are inadequate, "a court may remand for the agency to offer a fuller explanation of the agency's reasoning *at the time of the agency action*" or to allow the agency "to deal with the problem afresh by taking *new* agency action."  *Regents of the Univ. of Calif.*, 140 S. Ct. at 1908 (emphases in original) (internal quotation marks and citation omitted).  But, in any event, "[t]he norm is to vacate agency action that is held to be arbitrary and capricious and remand for further proceedings consistent with the judicial decision, without retaining oversight over the remand proceedings."  *Baystate Med. Ctr. v. Leavitt*, 587 F. Supp. 2d 37, 41 (2008); *see also N. Air Cargo v. Postal Serv.*, 674 F.3d 852,

861 (D.C. Cir. 2012).  The Court should not, at least at this stage of the proceedings, fashion its relief around how the SBA *might* decide, in its discretion, to act if the matter is remanded to the agency.  For present purposes, and in light of the strong presumption in favor of remand, the Court simply concludes that Smithy has established a likelihood of success on the merits—and therefore a likelihood of success in obtaining a remand—that warrants preserving the status quo for the time being.

**B.     Irreparable Harm**

The Court turns, next, to the question of irreparable harm.  Because The Woolworth has failed to show that it is likely to prevail on the merits, the Court will consider only whether Smithy will suffer an irreparable injury in the absence of emergency relief.  *See Greater New Orleans Fair Hous. Action Ctr. v. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011) ("[W]hen a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining [preliminary injunction] factors."); *Sherley*, 644 F.3d at 393 ("[W]e read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009) (Kavanaugh, J., concurring)); *Ark. Dairy Co-op Ass'n v. U.S. Dep't of Agric.*, 573 F.3d 815, 817 (D.C. Cir. 2009) (suggesting that a failure to show likelihood of success on the merits alone justifies the denial of temporary injunctive relief).[2]

---

[2] Moreover, even if the sliding-scale approach has survived *Winter*, *see supra* at 9–10, the Court would conclude that the remaining factors are insufficiently weighty to overcome Plaintiff's weak showing with respect to the likelihood of success on the merits with respect to the The Woolworth.

Smithy contends—and Defendants do not contest—that, absent a TRO, it will suffer irreparable harm because "it is likely that [the remaining RRF funds] will be exhausted before a decision on the merits of Plaintiffs' claims." Dkt. 15 at 12. Because the SBA is in the process of distributing (or attempting to distribute) the last of the remaining RRF funds—and because Smithy will not be able to seek damages under the APA for any possibly unlawful agency action once the fund has fully expired, *see, e.g.*, 5 U.S.C. § 702 (providing for "[a]n action in a court of the United States seeking relief other than money damages")—the Court concludes that Smithy is likely to suffer irreparable economic harm absent a temporary restraining order. *See, e.g.*, *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Supp. 3d 1, 59 (D.D.C. 2020) (explaining that "injuries are unrecoverable because the present suit arises under the APA, which does not allow for money damages"); *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) ("[I]f a movant seeking a preliminary injunction 'will be unable to sue to recover any monetary damages against' a government agency in the future because of, among other things, sovereign immunity, financial loss can constitute irreparable injury." (quoting *Brendsel v. Off. of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 66–67 (D.D.C. 2004)).

## C.    Balance of Equities and Public Interest

Finally, the Court turns to the last two factors—the balance of the equities and the public interest. The balance of the equities weighs the harm to Plaintiffs absent a TRO against the harm to the agency if the Court grants the motion. *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). And here, the harm to the SBA and the public-interest factor are "one and the same" because the government is the non-movant and because "the government's interest *is* the public interest." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C.

Cir. 2016).  Although the SBA correctly points out that two eligible RRF applicants may be deprived of some of their RRF funding if Smithy ultimately succeeds in obtaining relief, it is not true that, at this early stage, the Court must "decid[e] between paying the two plaintiff businesses or paying Eligible Applicants 135 and 151."  Dkt. 14 at 13.  The emergency relief requested by Plaintiffs simply would preserve the *possibility* that Smithy could get relief, while simultaneously leaving the door open for Applicants 135 and 151 to receive their full RRF funding after the Court has decided whether to issue a preliminary injunction and, if appropriate, after the Court has adjudicated the ultimate merits of the present dispute.  Even then, moreover, if the Court merely remands the dispute to the SBA, the agency will need to decide (at least in the first instance) whether Smithy is entitled to relief and, if so, the amount it is entitled to receive.  Because Defendants have not made a significant showing that the public—or anyone beyond Applicants 135 and 151—may be harmed by the entry of a temporary restraining order, the Court finds that the balance of equities tips in Smithy's favor and that a temporary restraining order is in the public interest.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** in part and **DENY** in part Plaintiffs' motion for temporary restraining order, Dkt. 5.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  December 20, 2022